United States District Court
Southern District of Texas
**ENTERED**
March 11, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

MAIDA'S BELTS AND BUCKLES, INC.,    §
    §
    §
    *Plaintiff,*    §
VS.    §    CIVIL ACTION NO. 4:22-cv-577
    §
    §
LASTING DESIGNS, LLC d/b/a MAIDA'S,    §
    §
    *Defendant.*    §
    §
    §

**ORDER**

Pending before the Court is Defendant Lasting Designs, LLC d/b/a Maida's ("Defendant"

or "Maida's Boots") Motion for Summary Judgment. (Doc. No. 33). Plaintiff Maida's Belts and

Buckles, Inc. ("Plaintiff" or "Maida's Belts") responded in opposition, (Doc. No. 35), to which

Defendant replied, (Doc. No. 36).[1] After reviewing the pleadings, the applicable law, and the

summary-judgment evidence, this Court **GRANTS IN PART** and **DENIES IN PART** the Motion

for the following reasons.

## I.    BACKGROUND

This is a trademark infringement and unfair competition dispute involving numerous

members of Houston's boot-and-belt-making Maida family. The Maida family patriarch, John

Laureto Maida, immigrated from Sicily, Italy to Houston, Texas sometime in the late 1800s. (Jason

C. Maida Decl., Doc. No. 35-1 at 1; Doc. No. 35-30 at 3). In 1901, John Laureto Maida started his

---

[1] This case involves numerous members of the Maida family. Plaintiff and Defendant are both entities owned and operated by members of the Maida family, and both businesses have "Maida's" in their name. To aid in distinguishing the two entities and the Maida family members associated with each, the Court will refer at times to Plaintiff as "Maida's Belts," and to Defendant as "Maida's Boots." These short names are derived from the primary type of products and services on which each party claims its business is focused. The use of these names is in no way a comment from the Court regarding the merits of either party's claims or arguments. It is simply a means to aid in clarity and to consistently distinguish the parties in this Order.

boot and shoe making career when he founded Maida & Cuccia in downtown Houston. (Doc. No. 35-30 at 3). He later founded the Houston Shoe Hospital, which specialized in shoe repair, and would come to influence his family's businesses for generations. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 2). That business flourished and currently has many locations across Houston. It is not involved in this dispute.

John Laureto Maida's son, Salvador J. Maida, Sr., took over running the Houston Shoe Hospital, and he ran it after his father's death. (Jason C. Maida Decl., Doc. No. 35-1 at 1). In addition to repairing shoes, Salvador J. Maida, Sr. also made hand-crafted boots and shoes, including boots for celebrities like Gene Autry. (Doc. No. 33-6 at 2). To ensure the next generation could inherit the Maida legacy, Salvador J. Maida, Sr. trained both of his sons, John L. Maida and Salvador J. Maida, Jr., in the art of boot making and shoe repair while they worked alongside him at the Houston Shoe Hospital. (*Id.*).

## A. The Defendant Maida's (Maida's Boots)

In 1983, Salvador J. Maida, Jr. left the Houston Shoe Hospital to start his own company, which was incorporated as Maida's Black Jack Boot Co., Inc. ("Maida's Black Jack"), and opened a store named "Maida's." (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 3). That store was first located in the Highland Village area of Houston and later relocated further west on Westheimer Road. (*Id.*). At his Maida's store, Salvador J. Maida, Jr. "fitted customers for hand-crafted boots and shoes, and sold accessories such as belts, purses, handbags, pocketbooks, wallets, ammunition bags," and other items made from leftover material from the boot-making process. (*Id.*).

In December 2009, after roughly 26 years in business, Maida's Black Jack filed for bankruptcy after it was unable to pay a personal injury claim made against the business. (*Id.*). Its owner, Salvador J. Maida, Jr., also personally filed for bankruptcy. (*Id.*). On June 21, 2010, the

Bankruptcy Court approved the Chapter 7 trustee's sale of Maida's Black Jack's property, free and clear of any liens, to Laura Plympton. The sale included all inventory at the shop and "[t]he use of the debtor's name, business telephone number, and any customer list." (Doc. No. 33-10 at 2–3) (Bankruptcy Order). Now known as Laura Maida Regan, Laura Plympton is Salvador J. Maida, Jr.'s daughter. (Laura Maida Regan Decl., Doc. No. 33-19).

In the months after the bankruptcy was finalized, Laura Maida Regan worked with her family to get the family's boot business up and running again, "as [their] family had planned." (*Id.*). At some point before August 2010, the family organized Lasting Designs, LLC, of which Regan's mother was the President. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 5). On August 11, 2010, Lasting Designs, LLC filed a d/b/a record with Harris County, Texas stating that Lasting Designs, LLC would conduct business under the name "Maida's." (*Id.*). Laura Maida Regan also declared that she "quickly transferred the property [she] received in the [Bankruptcy Order] to Lasting Designs, LLC, d/b/a Maida's." (Laura Maida Regan Decl., Doc. No. 33-19). There is no evidence of this transfer (beyond her declaration). She recalled that "written documentation of this transfer" existed, "but [she has] not been able to locate it." (*Id.*).

Since that time, Salvador J. Maida, Jr.'s branch of the Maida family has been doing business as "Maida's," specializing in custom boots and shoes while also offering for sale other accessories like belts, wallets, and handbags. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 8).

### B. The Plaintiff Maida's (Maida's Belts)

Just as Salvador J. Maida, Jr.'s branch of the family broke off from the Houston Shoe Hospital business, so too did another branch of the Maida family. While they were growing up, John L. Maida worked alongside his brother (Salvador J. Maida, Jr.) at the Houston Shoe Hospital. (Jason C. Maida Decl., Doc. No. 35-1 at 1). John's son, Jason C. Maida, also worked for the

Houston Shoe Hospital while he was in high school, where he learned the business of shoe repair from his grandfather and father. (*Id.*). During this time, Jason Maida developed a passion for making belts and collecting rare sterling silver buckles, which was an interest and specialty that was somewhat distinct from his boot and shoe making heritage. (*Id.* at 1–2).

In November 1990, when he was nineteen years old, Jason Maida, with his mother and father, started a belt and buckle business called "Maida's Belts and Buckles." (*Id.* at 2). His first store was inside one of the Houston Shoe Hospital locations, and his grandfather (Salvador J. Maida, Sr.) guided him through the early years of his business. (*Id.*). He now has a separate store on Westheimer Drive in Houston less than two and a half miles from Defendant's "Maida's" store. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 7). Maida's Belts and Buckles has been operating in Houston since it began in 1990. *See* (Jason C. Maida Decl., Doc. No. 35-1 at 3). Jason Maida's business does not manufacture or sell boots, shoes, or footwear. (*Id.* at 5).

## C. The Alleged Infringing Activity

Based upon the current record, the parties appear to have operated their respective businesses both using the Maida name for some time without conflict. As the saying goes, however, all good things must come to an end. In 2015, Salvador Maida III (cousin of Jason Maida, who is affiliated with Maida's Belts; and son of Salvador J. Maida, Jr., who is affiliated with Maida's Boots) asked if he could make an order of belts for Maida's Belts and Buckles. (*Id.* at 7). Jason Maida agreed to this request because Salvador Maida III was in need of work and Maida's Belts needed the belts made. *See* (*Id.*). Thus, the son of the Maida's Boots family began work for his cousin and Maida's Belts. (*See* (*Id.*). After this exchange, Jason Maida claims that Salvador Maida III failed to complete that order of belts for Maida's Belts and Buckles. (*Id.*). Instead, Jason Maida claims he discovered that Maida's Boots was selling belts in its store that were identical to those

that Maida's Belts sold at its store. (*Id.*). Moreover, Maida's Belts claims that by 2016, there was "confusion in the marketplace" because Maida's Boots had begun selling belts and buckles at its Maida's store. (Doc. No. 33-18 at 3) (Plaintiff's Interrogatory Responses).

This confusion allegedly continued to become more evident. Some of Maida's Belts' customers placed orders for custom belts and buckles, which Maida's Belts fulfilled, but when it came time for payment, the customers presented gift certificates from Maida's Boots' store to pay for the merchandise they had ordered. (Jason C. Maida Decl., Doc. No. 35-1 at 7). For example, in March 2019, one customer ordered two custom belts and two buckles from Maida's Belts. (Doc. No. 35-31 at 3). When the order was complete and the customer arrived to pay for the item, they presented a $2,000 gift certificate issued by Maida's Boots to pay for the items. (*Id.* at 2). This situation happened at least one more time, although the timeframe of when it occurred is not clear. (Doc. No. 35-32 at 2). Furthermore, multiple customers brought products to Maida's Belts for repair that were manufactured and sold by Maida's Boots. (Jason C. Maida Decl., Doc. No. 35-1 at 7). Maida's Belts admits that it accepted "Maida's" gift certificates from customers for payment even though Maida's Belts knew it had not issued the gift certificate. Maida's Belts understood that the certificates were issued by Maida's Boots, instead. (Doc. No. 33-9 at 3) (Defendant's Requests for Admission).

To address these concerns about confusion, Jason Maida, owner of Maida's Belts and Buckles, spoke with a lawyer in 2016 about protecting his business name and trademarks. (Jason C. Maida Decl., Doc. No. 35-1 at 5). He then filed a trademark application for the name "Maida's" in association with the products and services he provided under that mark. (*Id.*). On December 5, 2017, the United States Patent and Trademark Office ("USPTO") issued Maida's Belts two trademarks: Trademark Registration Nos. 5,348,998 and 5,348,999. (*Id.*). Registration No.

5,348,998 depicts the Maida name in a possessive form in standard characters. (Doc. No. 35-24 at

2). Registration No. 5,348,999 depicts the Maida name in possessive form in a stylized script font.



(Doc. No. 35-24 at 2) (Registration No. 5,348,998).



(Doc. No. 35-25 at 2) (Registration No. 5,348,999).

> Each mark was approved and issued for the following six classes of goods:
>
> 1. Int. Class 14: boxes of precious metal; cuff links; gemstone jewelry; jewelry; key chains as jewelry; slides for bolo ties;
> 2. Int. Class 16: money clips;
> 3. Int. Class 25: belts; hat bands;
> 4. Int. Class 26: belt buckles; belt clips;
> 5. Int. Class 35: retail store services featuring knives, clothing belts, belt buckles, cuff links, jewelry
> 6. Int. Class 40: custom manufacture of clothing belts, belt buckles, cuff links, money clips, jewelry.

(Doc. No. 35-24 at 2; Doc. No. 35-25 at 2). Jason Maida did not include boots, shoes, footwear, or

repair of boots and shoes in his application, as his goal with filing was to protect his craft of custom

belt and buckle manufacturing. (Jason C. Maida Decl., Doc. No. 35-1 at 5).

On December 30, 2021, Maida's Boots filed a Petition for Cancellation of Maida's federal

trademark registrations in the USPTO. (Doc. No. 28-1). Shortly thereafter, Maida's Belts filed this

lawsuit against Maida's Boots alleging claims for federal trademark infringement under the

Lanham Act, false designation of origin under the Lanham Act, common law trademark

infringement and unfair competition, and unjust enrichment. (Doc. No. 1 at 9–13). Maida's Belts

also seeks injunctive relief. (Id.). In its Answer, Maida's Boots brought three counterclaims against

6

Maida's Belts: declaratory judgment of trademark fair use, declaratory judgment of trademark registration invalidity, and unfair competition under the Lanham Act. (Doc. No. 8 at 20–26). That Cancellation proceeding was stayed by the filing of this lawsuit and remains stayed pending the outcome here. (Doc. No. 33 at 6).

Maida's Boots filed its Motion for Summary Judgment on all of Maida's Belts' claims, and that Motion is now ripe for resolution.

## II.    LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant.

7

*Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III. ANALYSIS

Maida's Boots (Defendant) moves the Court to grant summary judgment in its favor on each of Maida's Belts' claims: Trademark Infringement of Registered Maida's Marks in violation of Section 32(1) of the Lanham Act (Count I); False Designation of Origin in violation of Section 43(a) of the Lanham Act (Count II); Common Law Trademark Infringement (Count III); and Unfair Competition (Count IV) under Texas law; and Unjust Enrichment (Count V). Maida's Boots also moves on its affirmative defense of laches and its counterclaim for Declaratory Judgment of Trademark Registration Invalidity. The Court will address each in turn.

### A. Plaintiff's Trademark Infringement and Unfair Competition Claims (Counts I, II, III, IV)

As a preliminary matter, Maida's Belts alleges trademark infringement in violation of sections 32(1) and 43(a) of the Lanham Act, which are codified at 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a), respectively. Section 32(1) creates a cause of action for infringement of registered marks; Section 43(a) creates a cause of action for infringement of unregistered marks. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 n.8 (5th Cir. 2010) ("The Lanham Act provides separate causes of action for infringement of a registered mark and an unregistered mark."). The key difference between these causes of action is that only an owner or a true assignee of a mark has statutory standing to bring a claim under section 32(1). *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 616 (5th Cir. 2023). This is because section 32(1) protects registered marks, and only the owner of a mark may apply for registration. *Id.*

On the other hand, section 43(a) does not require that the plaintiff own the trademark at issue. *Id.* at 617. Accordingly, any challenge to Maida's Belts' ownership of the marks applies only

to Maida's Belts' infringement claim under section 32(1). *Id.* Otherwise, the same two elements and analysis apply to both causes of action. *Id.* at 616. To prevail on its section 32(1) and section 43(a) claims, "Plaintiff must show (1) it possesses a legally protectable trademark and (2) Defendant's use of this trademark creates a likelihood of confusion as to source, affiliation, or sponsorship." *Id.* (internal quotation omitted).

Maida's Belts also brings claims for trademark infringement and unfair competition under Texas law. These common-law claims have virtually identical elements to the statutory elements under the Lanham Act, so the analysis with respect to Maida's Belts' claims under the Lanham Act will be dispositive of its corresponding claims under Texas law as well. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.7 (5th Cir. 2010) (explaining that a trademark infringement and unfair competition action under Texas common law presents essentially no difference in issues than those under the Lanham Act); *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 711 (S.D. Tex. 2009) ("The same legal standard applies to Lanham Act infringement claims, Texas statutory trademark infringement claims, Texas common-law trademark infringement claims, and federal and state unfair competition claims."). Accordingly, the following analysis is applicable to Plaintiff's Counts I, II, III, and IV, and any distinctions between the causes of action will be specifically addressed.

In its Motion for Summary Judgment, Maida's Boots argues that Maida's Belts' trademark infringement claims fail for two reasons: (1) Maida's Belts does not own the marks at issue because Maida's Boots is the senior user and thus, the true owner of the marks; and (2) the Maida's marks are distinctive marks that have not gained secondary meaning, so they are not legally protectable marks. (Doc. No. 33 at 10). The Court will address each argument and its related issues in turn.

### 1. Ownership and Priority of Use: Who is the senior user?

First, Maida's Boots argues that it, not Maida's Belts, is the senior user of the Maida's marks. In trademark law, ownership is determined by priority of use. *See Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015) ("The party who first uses a mark in commerce is said to have priority over other users."). Generally, the first party to use a trademark becomes the holder of the mark and the "senior" user regardless of whether that party registers the mark first. *Rex Real Est. I, L.P.*, 80 F.4th at 844. This is because ownership of trademarks is established by use, not by registration. *Id.* Registering a mark with the USPTO does not "wipe out" any prior unregistered, common law trademark rights of others. 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:18.50 (5th ed.) (hereinafter "MCCARTHY").[2] The senior user of a trademark is entitled to enjoin "junior" users from using the mark, or one that is deceptively similar to it, subject to certain limits. *Union Nat. Bank of Texas, Laredo v. Union Nat. Bank of Texas, Austin*, 909 F.2d 839, 842–43 (5th Cir. 1990). The party seeking to prove prior use must do so by a preponderance of the evidence. 2 MCCARTHY § 16:20 (citing *Araujo v. Framboise Holdings Inc.*, 99 F.4th 1377, 1380 (Fed. Cir. 2024)).

Each side contends that it is the actual senior user of the Maida's marks. Maida's Boots' position is that it started using the marks first, so it is the senior user. Maida's Belts's position is that Maida's Boots cannot show it continuously used the marks from Maida's Black Jack's first use, so Maida's Belts is the senior user. Within these arguments, the parties raise three separate ownership-related issues the Court must address. (Doc. No. 33 at 10). The first question is whether Maida's Boots demonstrated a sufficient assignment and chain of title to its predecessor's use of

---

[2] The Fifth Circuit has cited as authority Professor McCarthy's treatise on Trademarks and Unfair Competition on multiple occasions. *See, e.g., Amazing Spaces*, 608 F.3d at 233; *Rex Real Est. I, L.P.*, 80 F4th at 619; *Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 185 n.6 (5th Cir. 2018). *See generally* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (5th ed.). Accordingly, the Court references this treatise when necessary.

the Maida's marks. The second question is whether Maida's Boots abandoned its use of the Maida's marks after its predecessor's bankruptcy. The third question is which party, if either, established secondary meaning (and thus ownership) first. The Court will address each issue in turn.

### a. Chain of Title from Maida's Black Jack to Defendant

First, the Court will address whether Maida's Boots has demonstrated a sufficient assignment of trademark rights and chain of title to its predecessor's use of the Maida's marks. As explained previously, Maida's Boots' predecessor (Maida's Black Jack) was founded in 1983 by Salvador J. Maida, Jr. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 3). In contrast, Jason Maida founded Maida's Belts in 1990. (Jason C. Maida Decl., Doc. No. 35-1 at 1).

Maida's Boots argues that it has demonstrated a sufficient chain of title to the trademark rights from Maida's Black Jack, beginning from its founding in 1983 to present day. Maida's Belts argues that Maida's Boots' evidence of trademark assignment is insufficient, so Maida's Boots cannot establish a chain of title running back to Maida's Black Jack's first use.

In order to enjoin junior users from using a mark, the senior user's use must be continuous and without abandonment, although some evolution in use over time is tolerated. *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 293 (5th Cir. 2004); *Helpful Hound, L.L.C. v. New Orleans Bldg. Corp.*, 331 F. Supp. 3d 581, 595–96 (E.D. La. 2018) (citing 2 MCCARTHY § 16:9). If owners have changed, one way to demonstrate continuous use is through an assignment of trademark rights. *See Dumdei v. Certified Fin. Planner Bd. of Standards, Inc.*, No. CIV. 398CV1938H, 1999 WL 787402, at *6 (N.D. Tex. Oct. 1, 1999) ("Generally, an assignment of a trademark and its accompanying goodwill will allow the assignee to "step into the shoes" of the assignor, gaining whatever priority date the assignor had in the mark."). In order to become a senior user through the valid assignment of a mark, the party claiming assignment must trace its title through a valid

11

chain of title, which consists of an unbroken line of use and good will going back to the date of the mark's first use. *See id.*; 2 MCCARTHY § 18:15 ("To prove the earliest priority of use, a person or company must be able to prove a chain of title extending back to the original user of the mark.").

The assignment issue in this case can be broken down into two alleged transfers: first, the bankruptcy trustee's transfer of Maida's Black Jack's business name and goodwill to Laura Maida Regan, and second, Regan's transfer of this property to Maida's Boots (a/k/a Lasting Designs, LLC). Maida's Belts does not challenge the first transfer of the Maida's trademarks and business goodwill. Instead, Maida's Belts focuses on the second alleged transfer from Regan to Maida's Boots. (Doc. No. 35 at 14).

In challenging the second alleged transfer, Maida's Belts cites the Lanham Act to argue that any transfer of an owner's interest in a trademark must be signed and in writing, and it must include the goodwill of the business connected with the mark. (Doc. No. 35 at 13–14 (citing 15 U.S.C. § 1060)). Maida's Belts claims Regan's alleged transfer to Maida's Boots, if it exists at all, is invalid because Maida's Boots cannot produce a writing memorializing the assignment of trademark rights or goodwill between Laura Maida Regan and Maida's Boots. (*Id.*).

The provision of the Lanham Act at issue specifies that a "*registered* mark or a mark for which an application to *register* has been filed" can only be transferred if there is an accompanying signed writing. 15 U.S.C. § 1060(a)(1), (3) (emphasis added). Maida's Boots argues that this provision does not apply to it because Maida's Boots does not claim it (or its predecessor) ever registered a Maida's mark that would have been subject to the statute's writing requirement. Maida's Boots' use of the Maida's mark is more properly characterized as a common law trademark, or an unregistered mark. *Trojan Battery Co., LLC v. Trojan EV, LLC*, No. 4:21-CV-

12

3075, 2024 WL 1331783, at *12 (S.D. Tex. Mar. 28, 2024) (explaining that "unregistered trademarks" are "also called common law trademarks").

An assignment *by writing* is not necessary to transfer ownership of a trademark under common law, but an assignment is still necessary. *Rex Real Est. I, L.P.*, 80 F.4th at 617 (citing 2 MCCARTHY § 18:4 (section titled "Proving the existence of an assignment")). Nevertheless, the Fifth Circuit requires "strong evidence to establish an assignment." *Id.* This requirement "is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the marks they employ." *Id.* (quoting *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997)).

The only evidence Maida's Boots presents to prove that any common law trademark rights in the Maida's mark were transferred from Laura Maida Regan to Maida's Boots is Regan's own declaration. That declaration states that Regan "quickly transferred the property [she] received in the [bankruptcy order] . . . to Lasting Designs, LLC d/b/a Maida's." (Laura Maida Regan Decl., Doc. No. 33-19 at 3). She also recalled that written documentation of the transfer existed, but she has been unable to locate that documentation. *Id.* ("I recall we had written documentation of this transfer[,] but I have not been able to locate it."). Maida's Belts argues that since there is no evidence of a written agreement or written document reflecting this alleged transfer, there is still a genuine issue of material fact as to whether there was an assignment, and thus a fact issue exists as to whether Maida's Boots or Maida's Belts is the senior user of the Maida's marks.

Neither party offers guidance to the Court regarding whether or not Regan's declaration is evidence that might be considered sufficiently "strong" to establish an assignment here. *See Rex Real Est. I, L.P.*, 80 F.4th at 617. That being so, the Fifth Circuit's indication that evidence stronger than "self-serving testimony" is required to show assignment of a common-law trademark leads

13

this Court to consider this single piece of evidence as not strong enough to declare as a matter of law that Maida's Boots sufficiently assigned its trademark rights to establish its continuous use of the "Maida's" mark. *Id.* Accordingly, an issue of material fact remains regarding Regan's alleged assignment of the trademarks to Lasting Designs, LLC (Maida's Boots). Therefore, this issue cannot be resolved at summary judgment.

### b.  Abandonment of the Maida's Marks

Next, Maida's Boots argues that Maida's Belts cannot demonstrate that Maida's Boots abandoned its use of the Maida's marks in the time between Maida's Black Jack's bankruptcy and when Maida's Boots resumed its use of the Maida's marks. (Doc. No. 33 at 12). Maida's Belts did not respond to or address Maida's Boots' attack on Maida's Belts' abandonment allegations, which in and of itself constitutes a waiver of this issue. *Del Toro v. Fiesta Mart, LLC*, No. 4:21-CV-1166, 2023 WL 3025072, at *2 (S.D. Tex. Apr. 20, 2023) (citing *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1164 (5th Cir. 1983)).

> Under the Lanham Act, a mark is deemed "abandoned"
>
> [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances . . . "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

*Vais Arms, Inc.*, 383 F.3d at 293 (quoting 15 U.S.C. § 1127). The party asserting abandonment must establish that the owner of the mark both (1) discontinued use of the mark and (2) intended not to resume its use. *Id.* The burden of proof is on the party claiming abandonment, which is Maida's Belts in this case. *Id.* Abandonment is normally an issue of fact. *FirstHealth of Carolinas, Inc. v. CareFirst of Maryland, Inc.*, 479 F.3d 825, 830 (Fed. Cir. 2007).

14

In its Motion, Maida's Boots argues that Maida's Belts has failed to meet its burden to raise an issue of material fact that supports its contention that Maida's Boots abandoned its use of the Maida's marks. This Court agrees.

In addition to the fact that Maida's Belts does not address the issue of abandonment in its response, Maida's Belts offers no evidence that would support an inference that Maida's Boots or its predecessor stopped using the Maida's marks or intended to not resume using the Maida's marks during the relevant time period. In contrast, Maida's Boots presents evidence that around the time the bankruptcy was finalized on June 21, 2010, Regan, Salvador J. Maida, Jr., and other members of that branch of the Maida family (that were affiliated with Maida's Black Jack) worked to return customer's items that had been completed before the business closed. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 5). This occurred throughout June and July of 2010. (*Id.*). By August 11th, Lasting Designs, LLC had been formed and registered with Harris County, Texas to do business as "Maida's." (Doc. No. 33-12 at 2–3).

This evidence demonstrates that Maida's Boots did not abandon its use of the Maida's mark after the bankruptcy and before Lasting Designs, LLC started using the mark. Throughout the summer, Regan and her family worked to fulfill the final customer orders and repairs that had been undertaken by Maida's Black Jack. Those orders were presumably completed under the name "Maida's" as that was the company those customers had purchased from originally. It is clear from its relatively quick reorganization as Lasting Designs, LLC, d/b/a Maida's that Maida's Boots intended to continue using the "Maida's" mark as the family reorganized and rebuilt after its bankruptcy. Even assuming Maida's Boots stopped using the marks in June and July, that time period is not sufficient to demonstrate abandonment of the marks. *See Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124–25 (5th Cir. 1973) (three or four year lapse in exercise of

control not enough to show abandonment); *Bennigan's Franchising Co., L.P. v. Sweet Onion, Inc.*, No. 08-CV-2132-F, 2009 WL 10678344, at *2 (N.D. Tex. Apr. 1, 2009) (explaining that the abandonment defense "is only available in the very limited and unusual situation where a trademark has lost all significance, i.e. the mark no longer represents the brand").

Accordingly, based on the uncontroverted facts, the Court finds as a matter of law that Maida's Boots did not abandon its use of the Maida's marks in the period between Maida's Black Jack's bankruptcy and the formation of Lasting Designs, LLC. The resolution of the abandonment issue does not change the fact that there still exists an issue of fact for resolution at trial regarding whether Regan executed a valid assignment of any original common law Maida's trademarks to Maida's Boots.

### c. Secondary Meaning and Prior Use

The final issue relevant in determining whether Maida's Belts or Maida's Boots is the senior user of the Maida's marks is the issue of secondary meaning. The parties discuss secondary meaning in their briefing as it relates to determining whether the Maida's mark is a legally protectable mark, but not in the context of priority of use.[3] Maida's Boots argues that the first party to use the mark in commerce establishes ownership of the mark, so the parties accordingly focused their analysis on which party started using the Maida's marks first. (Doc. No. 33 at 11) (citing *Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1347 (D.C. Cir. 2008)).

While this is a valid standard applicable to certain types of trademark disputes, it is not the standard that applies in cases that involve surname marks. Surname marks require secondary

---

[3] As is explained below, secondary meaning in the eyes of the consumer is an inquiry relevant to determining both whether a surname mark is legally protectable in the first place and to the priority of use inquiry. If a surname mark has not acquired secondary meaning, then it is not legally protectable under the Lanham Act. *See Rex Real Est. I, L.P.*, 80 F.4th at 619. The timing of *when* a surname mark developed secondary meaning is relevant to determining which party is the senior user. 2 MCCARTHY § 16:34. Secondary meaning is relevant to two issues the parties address in their briefing, but they only discussed secondary meaning in the context of one of those issues: whether the Maida's marks are legally protectable marks.

16

meaning to be valid trademarks. *Rex Real Est. I, L.P.*, 80 F.4th at 619.When two parties dispute who is the senior user of a surname mark, priority of use is not the test. The party who first achieved trademark significance through secondary meaning is the senior user of the surname mark. 2 MCCARTHY § 16:34; *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985); *Helpful Hound, L.L.C. v. New Orleans Bldg. Corp.*, 331 F. Supp. 3d 581, 596 (E.D. La. 2018) ("For a mark that is distinctive only because it has acquired secondary meaning, the senior user is the party that first developed secondary meaning.").

Accordingly, the key question is whether Maida's Belts or Maida's Boots established secondary meaning in the Maida's marks, and if so, who did it first. Furthermore, the senior user of the marks must have achieved secondary meaning prior to the junior user's first use of the marks. 2 MCCARTHY § 16:34 ("If the senior user cannot prove that its mark possessed secondary meaning at the time defendant commenced its use, there can be no infringement, for if there was no secondary meaning, there was no likelihood of confusion when the junior user arrived on the scene."); *see Brown v. Quiniou*, 744 F. Supp. 463, 469–70 (S.D.N.Y. 1990) ("[E]ven if secondary meaning is acquired, it will "not prevent the use of [the] term by one whose use had begun before the secondary meaning was acquired.") (quoting *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980)).

A mark develops secondary meaning "when, in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000) (internal quotations omitted). "Because the primary element of secondary meaning is a mental association in buyer[s'] minds between the alleged mark and a single source of the product, the determination whether a mark . . . has acquired secondary meaning is primarily an empirical inquiry." *Amazing Spaces*, 608

17

F.3d at 248 (quotation omitted). To determine whether a mark has acquired secondary meaning, courts in the Fifth Circuit consider these seven factors:

> (1) the length and manner of use of the mark or trade dress, (2) sales volume, (3) amount and manner of advertising, (4) the nature of the use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) defendant's intent in copying the mark.

*Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 190 (5th Cir. 2018). "Whether a mark has acquired secondary meaning is a question of fact." *Id.* The Court will now consider each factor in turn, keeping in mind that the issue is before this Court in a summary judgment context and that the relevant inquiry is which party developed secondary meaning in the Maida's marks first. *Helpful Hound, L.L.C.*, 331 F. Supp. 3d at 596.[4]

### (1) Length and Manner of the Use of the Mark

"Extensive periods of use can make a mark more likely to have acquired secondary meaning[,]" but "length of time alone is not always sufficient to establish secondary meaning." *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 177 (5th Cir. 2024) (internal citations omitted).

Maida's Belts first began using the Maida's marks in 1990 when it formed its business entity named "Maida's Belts and Buckles." (Jason Maida Decl., Doc. No. 35-1 at 2). It used the Maida's marks in association with its goods and services, "including but not limited to, belts,

---

[4] In their briefing, the parties do not frame the summary-judgment evidence according to the question of when in time their respective "Maida's" entity developed secondary meaning in the Maida's marks. The parties' secondary meaning analysis was only framed in the context of whether the Maida's marks are legally protectable marks. In that context, Maida's Boots argued that Maida's Belts had not developed secondary meaning in the marks, so they are not legally protectable marks. In its briefing, Maida's Boots does not argue that it developed secondary meaning in the Maida's marks. Nevertheless, Maida's Boots does argue that it is the senior user of the mark because it was using the Maida's mark before Maida's Belts started using the mark. Since Maida's Boots argues it is the senior user (albeit applying a standard inapplicable to surname marks), this Court applies Maida's Boots' arguments about why it is the senior user to the factors of the secondary meaning analysis. This was done in an effort to evaluate the summary-judgment evidence through the lens of which Maida's entity formed secondary meaning in the mark first (if either ever did), so that the Court can determine if one party has demonstrated that it is the senior user at the summary-judgment stage.

buckles, belt clips, money clips," and other western accessories of the like. (*Id.* at 3). As of 2025, Maida's Belts used the Maida's mark in its general branding for its business, including in the following ways: on signage in multiple areas in its showroom, (Doc. No. 35-4 at 2; Doc. No. 35-8 at 2); on signage in its money clip display case, (Doc. No. 35-7 at 2); as brand engraving on the back of the belt buckles it sells, (Doc. No. 35-14 at 2); on branded order forms used within the business, (Doc. No. 35-15 at 2; Doc. No. 35-16 at 2); on tags attached to merchandise for sale within the showroom, (Doc. No. 35-17 at 2); on the boxes customers' purchases are placed in after purchase, (Doc. No. 35-18 at 2–3), and on Maida's Belts' website, (Doc. No. 35-19 at 2). It also used the marks in its advertising materials. (Doc. No. 35-20 at 2–3).

Maida's Boots started using the Maida's mark in 1983 at its Houston store, which was called "Maida's." (Doc. No. 33-4 at 3). It used the mark on the outside of the building, (Doc. No. 33-7 at 2), and as branding inside the store's showroom, (Doc. No. 33-13 at 2). By 2014, Maida's Boots used the "Maida's" mark on its stagecoach which served as its mobile showroom. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 6; Doc. No. 33-14 at 2–3 (photo of stagecoach). It also used the Maida's mark in its advertising. (Doc. No. 35-30 at 2).

Both Maida's Belts and Maida's Boots have presented evidence sufficient to support an inference that they have both publicly and prominently associated their respective businesses with the term Maida's for decades. *See Appliance Liquidation Outlet, L.L.C.*, 105 F.4th at 377.

### *(2) Volume of Sales*

"Proof of a significant number of sales of goods or services using the alleged mark is relevant evidence from which to infer the existence of a secondary meaning." 2 MCCARTHY § 15:49. That being so, neither Maida's Belts nor Maida's Boots presents any evidence at summary judgment regarding its sales volume, so this factor favors neither party.

19

### (3) *Amount and Manner of Advertising*

"The relevant question with regard to factor three—the amount and manner of advertising—is not the *extent* of the promotional efforts, but their *effectiveness* in altering the meaning of the mark to the consuming public." *Viacom Int'l*, 891 F.3d at 191 (emphasis in original) (internal quotation omitted). Thus, this Court must focus on whether the parties have promoted with the marks and whether that promotion was effective. *Id.* The record contains evidence of the extent of the parties' advertising; however, there is little evidence addressing the effectiveness of this advertising at altering the meaning of the mark to the public.

Maida's Belts has invested heavily in advertising on both the local and national level. (Jason C. Maida Decl., Doc. No. 35-1 at 2). It advertises with the Maida's mark in magazines, print media, on billboards, in promotional materials, through newspapers, high school programs, and trade shows. (*Id.*). From 1999 through May 2, 2022, Maida's Belts has spent over a million dollars on advertising expenses. (*Id.*; Doc. No. 35-3 (Plaintiff's Advertising Expenses)). It is Jason Maida's opinion that "[l]ong ago, consumers came to associate the term "Maida's" in association with Maida's Belts and Buckles," and that it "has become one of the largest dealers of buckles and western jewelry made from precious metal." (Jason C. Maida Decl., Doc. No. 35-1 at 3).

Maida's Boots and its predecessor advertised its products with the Maida's mark; however, Salvador J. Maida, Jr. (previous principal of Maida's Black Jack) declared that a significant amount of its business is/was through "word of mouth" referrals and repeat customers, since the business is focused on providing custom services. (Salvador J. Maida, Jr. Dec., Doc. No. 33-4 at 6).

Overall, both parties have invested in advertising to different degrees. Maida's Boots' evidence that most of its customers are repeat customers or learned of Maida's Boots through word of mouth suggests that its promotional efforts have associated "Maida's" with quality custom

boots. (*Id.*). On the other hand, Maida's Belts also presented evidence that "long ago" consumers began associating "Maida's" with Maida's Belts' business and its quality belts and buckles. (Jason C. Maida Decl., Doc. No. 35-1 at 3). Setting aside the actual advertising expenses, in many ways, the evidence provided on this topic is just the basic opinion of both owners.

### (4) Nature of the Use of the Mark in Newspapers and Magazines

"In considering [this factor], courts consider to what extent third-party media have reported on the purported trade[mark]." *Appliance Liquidation Outlet*, 105 F.4th at 377 (quoting *Beatriz Ball, L.L.C. v. Barbagallo Co., L.L.C.*, 40 F.4th 308, 318 (5th Cir. 2022)) (alteration in original). This Court "must discern whether these publications impacted public perception of the trademark." *Id.* For context, in *Nola Spice*, the Fifth Circuit held that this factor did not weigh in favor of secondary meaning where the mark holder presented only "[t]wo short online articles" and offered "no evidence of these magazines' circulation or their impact on public perception." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 546 (5th Cir. 2015).

Both parties have used the mark to advertise their products and services in newspapers and magazines. Maida's Belts has advertised in Texas Monthly Magazine, (Doc. No. 35-20) (December 2009), and in the Houston Symphony Magazine, (Doc. No. 35-21) (no date visible on advertisement). Additionally, Maida's Belts and its principal, Jason Maida, were featured in a magazine article published in March 2016. (Doc. No. 35-35 at 1–2).

Similarly, Maida's Boots and Salvador J. Maida, Jr. were featured in the Houston Chronicle newspaper in October 2010. (Doc. No. 33-16).

Based upon the record, it appears that both Maida's Belts and Maida's Boots have developed a reputation associated with the Maida's marks in the Houston area, if not beyond, and that media sources have reported on that reputation. Here, however, neither party has offered any

21

evidence of the relevant magazines and newspaper's circulation, or other evidence that would be helpful to the Court in discerning their impact on the consuming public. *See Nola Spice*, 783 F.3d at 546.

### (5) Consumer-Survey Evidence

Neither party has presented any consumer-survey evidence for the Court to consider. The Fifth Circuit has "consistently expressed a preference for an objective survey of the public's perception of the mark at issue, but survey evidence is not required to establish secondary meaning." *Appliance Liquidation Outlet*, 105 F.4th at 379 (internal citations omitted).

### (6) Direct Consumer Testimony

The only direct consumer testimony presented is by Maida's Boots, and it is in the form of a Houston Chronicle newspaper article that talks about a Maida's customer named James Painter, who is a loyal customer, having purchased twelve pairs of custom boots from Maida's Boots. (Salvador J. Maida, Jr. Decl., Doc. No. 33-4 at 6; Doc. No. 33-16 at 3). The excerpt reads:

> [James Painter's] enthusiasm began nearly two decades ago, when . . . [he] found himself in need of custom cowboy boots to accommodate the quirks of aging feet. A friend offered a single suggestion: Maida's.
>
> I've been in love with Maida's boots ever since," Painter said.
>
> ***
>
> Many of [Maida's] customers, like Painter, have had money to spend, concepts in mind, and word-of-mouth recommendations to visit [Maida's].
>
> ***
>
> Painter, who has designed new boots for himself almost every year since slipping his feet into that first ostrich-skin pair, said he hadn't expected to be so involved in the process.

(Doc. No. 33-16 at 3, 6) (Houston Chronicle Article Dated October 27, 2016).

22

This single anecdote demonstrates that at least one consumer associated "Maida's" with Maida's Boots.

### *(7) Defendant's Intent in Copying the Mark*

For this factor, "[t]he relevant inquiry is whether [defendant] intended to derive benefits from [plaintiff]'s reputation by using the [trademark]. *Viacom*, 891 F.3d at 195–96. "Evidence that a defendant intends to 'pass off' its product as that of another can be found through imitation of packaging, similar distribution methods, and more." *Id.* at 196.

There is no evidence in the record that would indicate either party intended to "pass off" its product as that of the other "Maida's." In fact, it is entirely possible that both parties branded their business with the "Maida's" name to "pass off" on the legacy Salvador J. Maida, Sr. established through the Houston Shoe Hospital. Accordingly, at this time, this factor provides less weight in the situation currently before the Court.

### *Secondary Meaning Conclusion*

As a reminder, the inquiry of which party may have developed secondary meaning first is relevant to the ownership inquiry because the senior user of a surname trademark (like the Maida's mark) is not the party who first used the mark; it is the party that first developed secondary meaning in the mark. 2 MCCARTHY § 16:34; *Levi Strauss & Co*, 778 F.2d at 1358; *Helpful Hound, L.L.C.*, 331 F. Supp. 3d at 596. Accordingly, if Maida's Belts is the junior user of the marks (and not the senior user), it may not have rights to enjoin Maida's Boots for infringement. *See Union Nat'l Bank*, 909 F.2d at 842–43 ("The first one to use a mark is generally held to be the 'senior' user and is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar to it, subject to limits imposed by the senior user's market and natural area of expansion.").

23

After considering all the factors relevant to secondary meaning, the Court concludes that disputes of material fact remain. A reasonable jury could find that either Maida's Belts or Maida's Boots had acquired secondary meaning at some point in time. Both parties have put forth evidence that, considered all together, might suggest that "in the minds of the public, the primary significance" of "Maida's" is to identify Maida's Belts or Maida's Boots and its respective products/services. *Appliance Liquidation Outlet*, 105 F.4th at 380. At the same time, a reasonable jury could also find that neither party developed secondary meaning in the Maida's marks.

Additionally, the summary-judgment record is lacking in evidence regarding which party may have established secondary meaning first, and whether that occurred before the junior user began using the Maida's marks. That inquiry is necessary to determine which party was the senior user of the Maida's marks and, thus, which party owns the marks at issue in this case. Without evidence to discern which party may have established secondary meaning first, this Court cannot declare at summary judgment that Maida's Boots is the prior user of the mark or that Maida's Belts has failed to establish secondary meaning, like Maida's Boots moves for in this Motion.

This conclusion is supported by the fact that the Fifth Circuit has cautioned against granting summary judgment on fact-intensive issues similar to the inquiry into secondary meaning in trademark cases. *Cf. Git-R-Done Prods., Inc. v. Giterdone C Store, LLC*, No. 1:15CV386-LG-RHW, 2017 WL 11681357, at *3 (S.D. Miss. Jan. 9, 2017) (explaining the Fifth Circuit's caution against granting summary judgment on fact-intensive trademark issues such as likelihood of confusion). The Court, and this case, would benefit from further development of the factual record at trial.

24

### d.  Ownership and Priority of Use Conclusion

As the Court previously mentioned, in trademark law, ownership of a mark is determined by priority of use, not federal registration. *Rex Real Est. I, L.P.*, 80 F.4th at 844. Accordingly, to maintain a claim for trademark infringement in violation of Section 32(1) of the Lanham Act (infringement of registered marks), Maida's Belts must demonstrate that it owns the marks at issue. *Id.* at 616. To demonstrate its ownership, Maida's Belts must show that it continuously used the Maida's marks and that it developed secondary meaning in the marks. *Helpful Hound, L.L.C.*, 331 F. Supp. 3d at 595–96. On the other hand, if Maida's Boots wishes to prevail on its contention that it is the senior user of the Maida's marks, it must demonstrate its continuous use of the marks and that it developed secondary meaning. Accordingly, the parties raised three separate issues relevant to this ownership inquiry: (1) whether the alleged assignment of trademark rights between Laura Maida Regan and Maida's Boots was sufficient to establish continuous use; (2) whether Maida's Boots abandoned its use of the Maida's marks; and (3) whether either part sufficiently demonstrated it had developed secondary meaning in the Maida's marks.

After examining the issues relevant to the ownership of the marks at issue, the Court concludes that, as a matter of law, Maida's Boots did not abandon its use of the Maida's marks in the time between June and August of 2010. That being the case, the Court also finds that material disputes of fact exist regarding whether Maida's Boots can demonstrate an unbroken chain of title to its predecessor's first use (or more relevant, when or if its predecessor may have achieved secondary meaning). There are also fact issues regarding which party established secondary meaning in its use of the Maida's mark first and thus has ownership of the mark.

Accordingly, genuine issues of material fact remain regarding the ownership element of Maida's Belts' trademark infringement claim.

## 2. Are the Maida's Marks "Legally Protectable Marks?"

Having addressed the parties' arguments regarding ownership of the Maida's marks, the Court now turns to their arguments regarding whether "Maida's" is a legally protectable mark under trademark law. To satisfy the first element of its trademark infringement claim, Maida's Belts must demonstrate that the Maida's marks are legally protectable trademarks. *Rex Real Est. I, L.P.*, 80 F.4th at 618; *Union Nat'l Bank*, 909 F.2d at 844. A trademark that is "primarily merely a surname" is a descriptive term that is not protectable based upon mere adoption and use. *See* 15 U.S.C. § 1052(e)(4). To acquire legally protectable status, a surname must have acquired secondary meaning or distinctiveness, that is, the marks are uniquely associated with a specific source in the minds of the public. 15 U.S.C. § 1052(e)(4); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 291 n.6 (5th Cir. 2004); s*ee Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008). It is an undisputed fact that the marks at issue in this case are the Maida family's shared surname and thus fall under this rule.[5]

In its Motion, Maida's Boots argues that the Maida's marks are not legally protectable because they are not distinctive, meaning that they have not acquired secondary meaning. (Doc. No. 36 at 2). Maida's Belts contends that at a minimum a fact issue exists as to whether its marks have acquired secondary meaning.  The parties also dispute the applicability of the presumption of validity to this element of Maida's Belts' trademark infringement claims.

Proof that a mark has been registered with the USPTO typically constitutes prima facie evidence both of the applicant's ownership and that the mark is valid, and thus legally protectable.

---

[5] The fact that a mark is a surname is not diminished by the fact that the term is presented in its plural or possessive form. *See In re Bed & Bars Ltd.*, 122 U.S.P.Q.2d 1546, 1551 (T.T.A.B. 2017) (noting that presenting BELUSHI in the possessive form "is consistent with perception of the term as a surname"). Despite the fact that both of Plaintiff's registered marks depict the surname "Maida" in its possessive form, the marks still qualify as surnames under the Lanham Act. *Id.*

*See Amazing Spaces*, 608 F.3d at 237. In other words, registration gives rise to the presumption of validity. *Id.* This presumption is slightly altered in cases involving registered surname trademarks, however. Proof that a surname trademark has been registered with the USPTO creates a presumption that the registered mark had acquired distinctiveness, or secondary meaning, at the time of its registration. *See All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 507 n.10 (5th Cir. 2018); *Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 1356 (Fed. Cir. 2009) ("[T]he presumption of validity that attaches to a Section 2(f) registration includes a presumption that the registered mark has acquired distinctiveness.").[6] This is because a surname mark cannot be registered with the USPTO unless the party seeking registration proves that the mark "has become distinctive of the applicant's goods in commerce," which means that it has acquired a "secondary meaning." *See* 15 U.S.C. § 1052(e), (f). In other words, a registered surname trademark gives rise to a presumption that the mark had acquired secondary meaning at the time of registration, since the USPTO would not have registered it absent a sufficient showing of secondary meaning. *See id.*; *All. for Good Gov't*, 901 F.3d at 507 n.10.

This presumption of acquired distinctiveness is, however, rebuttable. Maida's Boots can overcome this presumption by producing evidence sufficient to show by a preponderance of the evidence that the Maida's marks did not have secondary meaning at the time of registration. *See Amazing Spaces*, 608 F.3d at 237–39; *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 883 (8th Cir. 2014) (citing *Cold War Museum*, 586 F.3d at 1356); *S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.*, No. CV 06-9170, 2011 WL 13203106, *7 n.9 (E.D. La. Mar. 23, 2011); 2 McCarthy §§ 15:32–15:34. This burden is one of production rather than persuasion. *See*

---

[6] Plaintiff's word marks were registered under Section 2(f) of the Lanham Act, which allows registration based on evidence that the mark has "become distinctive" based on "proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f); (Doc. No. 35-24 at 2); (Doc. No. 35-25 at 2).

27

*Amazing Spaces*, 608 F.3d at 237–39; *Pearson's Inc. v. Ackerman*, No. 7:18-CV-00013-BP, 2019 WL 3413501, at *17 (N.D. Tex. July 29, 2019) (applying *Amazing Spaces* to the presumption of acquired distinctiveness as of the date of registration). If Maida's Boots can produce sufficient evidence, then the presumption of validity is reduced simply to evidence that the USPTO was of the opinion the Maida's marks had acquired distinctiveness sufficient to be legally protectable as a mark. *See Amazing Spaces*, 608 F.3d at 237–39.[7]

Maida's Belts has sufficiently raised the presumption of validity and acquired distinctiveness because it presented proof of its trademark Registration Nos. 5,348,998 and 5,348,999 with the USPTO. (Doc. No. 35-24 ("Maida's" mark), Doc. No. 35-25 ("*Maida's*" mark)). *See Amazing Spaces, Inc.*, 608 F.3d at 237. As a result, the burden of production shifts to Maida's Boots to produce evidence that the Maida's marks had not acquired secondary meaning at the time of registration. *See id.*

This Court already determined that there is a fact issue regarding whether or when either party may have developed secondary meaning in its use of the Maida's marks. *See* discussion above in Section III.A.1.iii. Rather than conduct two separate secondary meaning analyses based on different relevant timeframes, this Court determines it to be more appropriate to allow one fact finder to hear all of the evidence regarding the timeline of each party's development of any secondary meaning. Then, the fact finder can determine if the Maida's marks ever acquired secondary meaning, making them legally protectable marks, and if so, which party established secondary meaning first, determining whether Maida's Belts or Maida's Boots is the senior user. For these reasons, a dispute of material fact remains on a required element of Maida's Belts' claims: whether the marks at issue are legally protectable marks.

---

[7] The parties discuss the applicability of the broader presumption of validity, but they fail to address the more specific presumption of acquired distinctiveness, which applies to registered surname marks.

### 3. Conclusion on Plaintiff's Trademark Infringement Claims

In summary, genuine issues of material fact exist regarding the resolution of multiple elements of Plaintiff's trademark infringement claims, so Defendant's Motion for Summary Judgment is **DENIED**.

### B. Plaintiff's Common Law Unjust Enrichment Claim (Count V)

Next, Maida's Boots moves for summary judgment on Maida's Belts' claim for unjust enrichment under Texas law, arguing that "Plaintiff has made no specific allegations of fraud, duress, or the taking of an undue advantage with respect to its claim for unjust enrichment," and thus cannot establish a dispute of material fact. (Doc. No. 33 at 17).

Under Texas law, unjust enrichment is an implied-contract basis for requiring restitution when it would be unjust to retain benefits received. *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.). Unjust enrichment allows recovery "when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). It is "based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (internal quotation marks omitted).

Maida's Belts has not presented any evidence that would suggest Maida's Boots obtained any benefit from Maida's Belts by fraud, duress, or the taking of undue advantage. In fact, Maida's Belts does not address Maida's Boots' arguments at all in its response. Accordingly, Maida's Belts fails to raise a genuine issue of material fact sufficient to preclude summary judgment as to this claim. *Fischer v. Fischer*, No. 05-23-00679-CV, 2025 WL 3055619, at *11 (Tex. App.—Dallas Oct. 31, 2025, no pet.) (affirming that plaintiff failed to raise a genuine issue of fact regarding an element of her unjust enrichment claim when she failed to cite any evidence in support of her

29

argument). That being so, Defendant's Motion for Summary Judgment is **GRANTED** as to this claim, and Maida's Belts' common law unjust enrichment claim is **DISMISSED** with prejudice.

## C. Defendant's Laches Defense

Maida's Boots next moves for summary judgment on its affirmative defense of laches. In doing so, it argues that Maida's Belts knew about Maida's Boots' predecessor's ongoing use of the "Maida's" name for its business when Maida's Belts adopted "Maida's" and started using it for its own business. (Doc. No. 33 at 17).

"Laches is an inexcusable delay that results in prejudice to the defendant." *Smack Apparel*, 550 F.3d at 489. Laches has three elements: "(1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay." *Id.* at 490. The Fifth Circuit has explained that the relevant period of delay for purposes of the laches defense runs from when the plaintiff knew or should have known of the infringing use until the plaintiff demands that the defendant cease and desist. *See Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) ("The period for laches begins when the plaintiff knew or should have known of the infringement."). Infringement only occurs when there is a likelihood of confusion between the products of the plaintiff and defendant, however. *See Blue Bell Bio–Med. v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989). "Laches is not established by undue delay and prejudice. Those factors merely lay the foundation for the trial court's exercise of discretion." *Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.*, 934 F. Supp. 796, 810 (S.D. Tex.1996) (quoting *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995)). Laches, as an equitable defense, is an issue of law for the Court to decide. *Reservoir, Inc. v. Truesdell*, No. CIV.A. 4:12-2756, 2013 WL 5574897, at *5 n.10 (S.D. Tex. Oct. 9, 2013). A district

30

court enjoys considerable discretion in deciding the issue of laches. *National Ass'n of Gov't Employees v. City Public Service Bd.*, 40 F.3d 698, 707 (5th Cir. 1994).

Maida's Boots argues that since Maida's Belts and Maida's Boots have coexisted in Houston for over a period of 35 years, Maida's Belts' trademark infringement claim is barred by laches. That evidence by itself is not sufficient for the Court to find as a matter of law that laches applies here. The laches period begins "when the plaintiff knew or should have known of the infringement." *Elvis Presley*, 141 F.3d at 205. Without undisputed facts establishing when Maida's Belts learned of any infringement (and the resulting existence of consumer confusion), the Court cannot find as a matter of law that Maida's Belts' infringement claims should be barred by laches. *See* 4 MCCARTHY § 31:17 ("If there is no evidence that the trademark owner knew or should have known of the infringing use, sometimes decades can pass without a laches defense being created.") (citing *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321 (5th Cir. 2008) (affirming district court's denial of laches defense when plaintiff had no reason to know of defendant's low-level infringement for 20 years).

At this time, the record reflects some level of confusion by consumers, but it is not conclusive and undisputed as to when Maida's Belts may have known or should have known of any infringement. At some point Maida's Belts' customers presented gift certificates issued by Maida's Boots to pay for products they had ordered from Maida's Belts, but the record does not disclose when this began to occur. *See* (Jason C. Maida Decl., Doc. No. 35-1 at 7). One such gift certificate and associated order occurred in 2019. (Doc. No. 35-31 at 2–3). Additionally, customers have presented to Maida's Belts multiple products to repair that were manufactured instead by Maida's Boots. *See* (*Id.*; Doc. No. 35-33 at 2; Doc. No. 35-34 at 2–3). From this evidence, it

31

appears that some element of confusion arose at some point in time. What is not clear is when that confusion (or infringement) may have begun.

According to the summary-judgment record, Jason Maida agreed to allow Salvador Maida III (affiliated with Maida's Boots) to make belts for Maida's Belts around 2015. (Jason Maida Decl., Doc. No. 35-1 at 7). He did not discover until "some time later" that Maida's Boots was selling in its store "identical" belts to those sold by Maida's Belts. (*Id.*). Around 2016 is when Jason Maida sought legal counsel to protect his trademarks, and in 2017 he filed his trademark applications with the USPTO. (Jason Maida Decl., Doc. No. 35-1 at 5). Maida's Boots did not file a Petition for Cancellation of Maida's federal trademark registrations in the USPTO until December 30, 2021. (Doc. No. 28-1). Based on the current record, the Court cannot grant Maida's Boots summary judgment on this equitable defense as a matter of law. *See e.g.*, *New Century Fin., Inc. v. New Century Fin. Corp.*, No. C-04-437, 2005 WL 2453204, at *10 (S.D. Tex. Oct. 4, 2005) ("In the trademark context, six years of delay do not necessarily constitute laches as a matter of law.") (collecting cases).

Accordingly, Defendant's Motion for Summary Judgment is **DENIED** as to its laches defense.

### D. Defendant's Declaratory Judgment Claim of Trademark Invalidity

In its Counterclaim, Maida's Boots brings a claim for Declaratory Judgment of Trademark Registration Invalidity, specifically asking this Court to cancel Plaintiff's trademark registrations.

Section 37 of the Lanham Act provides that "[i]n any action involving a registered mark the court may . . . order the cancellation of registrations, in whole or in part." 15 U.S.C. § 1119. Maida's Boots argues that this Court should exercise this statutory authority and cancel Plaintiff's

32

federal Registration Nos. 5,348,998 and 5,348,999 because Plaintiff cannot meet its burden of showing that either of the Maida's marks are distinctive to Maida's Belts. (Doc. No. 33 at 16).

As detailed previously, a fact issue remains as to whether the Maida's marks have gained secondary meaning and thus, acquired distinctiveness. Accordingly, issuing a declaratory judgment and/or cancellation of Plaintiff's marks is inappropriate at this stage in the litigation. Defendant's Motion for Summary Judgment on its Declaratory Judgment Claim of Trademark Invalidity is **DENIED**.

## IV.   CONCLUSION

First, Defendant's Request to File its Summary Judgment Motion Out of Time (Doc. No. 34) is **GRANTED**.

Second, for the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

The Motion is **GRANTED** as to Plaintiff's unjust enrichment claim (Count V), and that claim is **DISMISSED** with prejudice.

Additionally, the Motion is **GRANTED** as to the issue of abandonment, and the Court finds as a matter of law that Defendant did not abandon its use of the Maida's marks in the period between Maida's Black Jack's bankruptcy and the formation of Lasting Designs, LLC.

The Motion is **DENIED** as to Plaintiff's remaining claims (Counts I, II, III, and IV), Defendant's affirmative defense of laches, and Defendant's counterclaim for Declaratory Judgment of Trademark Registration Invalidity.

All deadlines in this case were terminated pending the Court's ruling on Defendant's Motion for Summary Judgment. Accordingly, the Court will enter an Amended Scheduling Order alongside this Order that will see this case to its conclusion.

It is so ordered.

Signed on this the ___10th___ day of March, 2026.

Andrew S. Hanen
United States District Judge

34